USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 3/23/2026

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

LASHES BY KATIE, LLC, and THU SUONG DONG,

                    Plaintiffs,

         - against -

LEND BUG, LLC, LENDBUG 2, LLC, and CYNTHIA KOLB,

                    Defendants.

**25 CV 6250 (VM)**

**DECISION AND ORDER**

**VICTOR MARRERO, United States District Judge.**

In this action, plaintiffs Lashes by Katie, LLC, and Thu Suong Dong (collectively, "Katie") bring claims against defendants Lend Bug, LLC, Lendbug 2, LLC ("Lend Bug 2"), and Cynthia Kolb ("Kolb," and collectively, "Lend Bug"). Katie alleges violations of law in connection with a settlement agreement. (See "First Amended Complaint" or "FAC," Dkt. No. 37.) Lend Bug now moves to dismiss Katie's claims pursuant to Federal Rule of Civil Procedure ("Rule") 12(b)(1) for lack of subject matter jurisdiction and Rule 12(b)(6) for failure to state a claim. (See "MTD," Dkt. No. 51.) For the reasons set forth below, Lend Bug's motion to dismiss is **GRANTED** in part and **DENIED** in part.

1

## I.    BACKGROUND[1]

Katie is a Maryland-based salon specializing in eyelash extensions and skincare. (See FAC ¶ 7.) In March 2024, Katie contacted Lend Bug – a merchant creditor – requesting a merchant cash advance. (See id. ¶¶ 9, 12.) Lend Bug loaned Katie approximately $25,000 in March 2024 (the "Future Receivables Sale and Purchase Agreement") and an additional $15,000 in April 2024. (See id. ¶¶ 12, 14, 41.) On June 6, 2024, after Katie was unable to pay the loan installments in full, Lend Bug filed an action in Connecticut Superior Court and received a judgment in its favor (the "Connecticut Judgment"). (See id. ¶ 18.) On May 29, 2025, the parties executed a settlement agreement (the "Agreement") to resolve Lend Bug's attempts to collect on the Connecticut Judgment and establish a payment plan. (See id. ¶¶ 35, 40; Agreement, Dkt. No. 37-3.) The balance on the account at the time the Agreement was executed was $59,859.28. (See id. ¶ 41.)

The Agreement provided that "[u]pon receipt of the first payment and for so long as [Katie] shall not be in default under this Agreement [Lend Bug] shall forbear from taking any collection action on [Katie's] accounts it may otherwise be

---

[1] Except as otherwise noted, the following background derives from the First Amended Complaint. (See Dkt. No. 37.)

entitled to." (Id. ¶ 42; Agreement at 3.) Katie alleges that Lend Bug failed to comply with those terms by taking collection actions while Katie was still in compliance with the Agreement - garnishing $12,754.08 from Katie's accounts through Middlesex Federal Savings and placing a $70,000 Uniform Commercial Code ("UCC") hold on the accounts. (See FAC ¶¶ 47, 50-52.) Katie additionally asserts that Lend Bug caused a $57,000 hold to be placed on an account held at Novo Bank, resulting in a negative balance of -$57,188.85, which prevented Katie from accessing customer payments. (See id. ¶ 53.)

Katie alleges twelve causes of action. In Count One, Katie brings a breach of contract claim, asserting that Lend Bug's failure to forbear from taking any collection action pursuant to the terms of the Agreement resulted in "severe operational and financial harm" to the business. (Id. ¶¶ 61, 72-82.) In Counts Two through Five, Katie alleges fraud and fraudulent misrepresentation, unjust enrichment, intentional interference with business relations, and conversion. (See id. ¶¶ 83-120.) In Count Six and Count Seven, Katie asserts violations of New York General Business Law § 349 and Connecticut General Statute § 37-4, respectively. (See id. ¶¶ 121-35.) Katie brings Counts Eight through Ten against

3

defendant Kolb – Lend Bug's Director of Collections and agent – in her individual capacity, claiming tortious interference with business relations, defamation, and intentional infliction of emotional distress. (See id. ¶¶ 136-52.) In Count Eleven, Katie asserts that Lend Bug violated UCC § 9-625(b), which states that a secured party that fails to comply with the requirements of Article 9 is liable for "any loss caused by a failure to comply." (Id. ¶¶ 153-60.) And in Count Twelve, Katie alleges violations of New York General Obligations Law § 5-501(1) and New York Banking Law § 14-a(1). (See id. ¶¶ 161-69.)

On November 26, 2025, Lend Bug filed its motion to dismiss, supported by a memorandum of law and supporting exhibits. (See Dkt. No. 51; "Mem.," Dkt. No. 51-16.) On December 16, 2025, Katie filed an opposition. (See "Opp'n," Dkt. No. 54.) On December 24, 2025, Lend Bug filed a reply. (See "Reply," Dkt. No. 56.)

## II.  LEGAL STANDARD

When the matter before the Court involves a motion to dismiss pursuant to Rules 12(b)(1) and 12(b)(6), the Court must consider the Rule 12(b)(1) motion first because "disposition of a Rule 12(b)(6) motion is a decision on the merits, and therefore, an exercise of jurisdiction." Gannon

v. 31 Essex St. LLC, No. 22-CV-1134, 2023 WL 199287, at *2 (S.D.N.Y. Jan. 17, 2023) (internal quotation marks and citation omitted).

Pursuant to Rule 12(b)(1), the Court must dismiss a case for lack of subject matter jurisdiction if the Court "lacks the statutory or constitutional power to adjudicate it." Makarova v. United States, 201 F.3d 110, 113 (2d Cir. 2000) (citing Fed. R. Civ. P. 12(b)(1)). The party asserting subject matter jurisdiction bears the burden of establishing, by a preponderance of the evidence, that jurisdiction exists. See Morrison v. Nat'l Australia Bank Ltd., 547 F.3d 167, 170 (2d Cir. 2008) (citation omitted). "[T]he court must take all facts alleged in the complaint as true," Nat. Res. Def. Council v. Johnson, 461 F.3d 164, 171 (2d Cir. 2006) (citation omitted), but "no presumptive truthfulness attaches to the complaint's jurisdictional allegations." Guadagno v. Wallack Ader Levithan Assocs., 932 F. Supp. 94, 95 (S.D.N.Y. 1996).

When evaluating a Rule 12(b)(1) motion, the Court may consider evidence outside of the pleadings to resolve the disputed jurisdictional fact issues. See Zappia Middle East Construction Co. Ltd. v. Emirate of Abu Dhabi, 215 F.3d 247, 253 (2d Cir. 2000). "However, argumentative inferences favorable to the party asserting jurisdiction should not be

drawn." Atlantic Mut. Ins. Co. v. Balfour Maclaine Int'l Ltd., 968 F.2d 196, 198 (2d Cir. 1992).

To survive a motion to dismiss pursuant to Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. (citing Twombly, 550 U.S. at 556). When ruling on a motion to dismiss pursuant to Rule 12(b)(6), the Court accepts all factual allegations in the complaint as true and draws all reasonable inferences in the plaintiff's favor. See Holmes v. Grubman, 568 F.3d 329, 335 (2d Cir. 2009). In considering a Rule 12(b)(6) motion, a district court may also consider "documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint." Doe v. N.Y. Univ., No. 20-CV-1343, 2021 WL 1226384, at *10 (S.D.N.Y. Mar. 31, 2021) (citation omitted).

## III. **DISCUSSION**

A.    LEND BUG 2

Before the Court analyzes each of Katie's claims, it first addresses Lend Bug's argument that the causes of action against Lend Bug 2 should be dismissed because Katie does not assert any non-jurisdictional allegations against the entity, which was not a party to the Agreement or Connecticut Judgment. (See Mem. at 7.)

"In general, under New York law, a breach of contract action may only be maintained against a party to the contract." Jennings v. Hunt Cos., Inc., 367 F. Supp. 3d 66, 71 (S.D.N.Y. 2019) (citation and alteration omitted); see also, Martell Strategic Funding LLC v. American Hosp. Acad., No. 12-CV-627, 2019 WL 632364, at *4 (S.D.N.Y. Feb. 14, 2019). And "a party who is not a signatory to a contract generally cannot be held liable for breaches of that contract." TransformaCon, Inc. v. Vista Equity Partners, Inc., No. 15-CV-3371, 2015 WL 4461769, at *3 (S.D.N.Y. July 21, 2015).

Nevertheless, in certain circumstances, courts have found that an entity may be held liable for a breach of contract even where it is not a formal party or signatory to the contract. For example, a contract may bind a party that did not sign the contract where "the contract was signed by

7

the party's agent, the contract was assigned to the party, or the signatory is in fact the 'alter ego' of the party." Malmsteen v. Univ. Music Grp., Inc., 940 F. Supp. 2d 123, 135 (S.D.N.Y. 2013) (citation omitted). Moreover, "nonsignatories may be held liable for breach of contract, without being 'alter egos,' if their actions show that they are in privity of contract or that they assumed obligations under the contract." MBIA Ins. Corp. v. Royal Bank of Canada, 706 F. Supp. 2d 380, 397 (S.D.N.Y. 2009).

Here, Katie argues that Lend Bug 2 "was affirmatively involved in the transaction and post-settlement enforcement conduct" as indicated by its identification on the contractual paperwork and its "sharing [of] the address used in connection with the challenged actions." (Opp'n at 5-6.) While the Court may ultimately find that Lend Bug 2 cannot be held liable for the alleged breaches of contract, here, at the pleading stage, "the parties' submissions present factual disputes that cannot be resolved on a motion to dismiss." Stewart v. Metro. Life Ins. Co., No. 21-CV-8092, 2025 WL 2710112, at *7 (S.D.N.Y. Sept. 22, 2025). Accordingly, the Court will not dismiss the claims against Lend Bug 2 on this basis.

B.    SUBJECT MATTER JURISDICTION

At the outset, Lend Bug argues that the Court must dismiss the action because Katie fails to show that the amount in controversy satisfies the jurisdictional minimum. (See Mem. at 8.) Here, given the high bar for dismissal for failure to plead a sufficient amount in controversy, the Court is unpersuaded that it lacks subject matter jurisdiction.

To invoke the Court's diversity jurisdiction, Katie must show that (1) the parties are of diverse citizenship and (2) the amount in controversy exceeds $75,000. See Waldman v. Escobar, No. 08-CV-6405, 2009 WL 861068, at *4 (S.D.N.Y. Mar. 27, 2009) (citing 28 U.S.C. § 1332(a)). A plaintiff "has the burden of proving that it appears to a 'reasonable probability' that the claim is in excess of the statutory jurisdictional amount." Tongkook America, Inc. v. Shipton Sportswear Co., 14 F.3d 781, 784 (2d Cir. 1994). "This burden, in most cases, is hardly onerous . . . for [courts] recognize a rebuttable presumption that the face of the complaint is a good faith representation of the actual amount in controversy." Bracken v. MH Pillars Inc., 290 F. Supp. 3d 258, 262 (S.D.N.Y. 2017) (internal quotation marks and citation omitted).

9

However, a defendant can overcome this rebuttable presumption if they can show to "a legal certainty that [the plaintiff] could not recover the amount alleged or that the damages alleged were feigned to satisfy jurisdictional minimums." Colavito v. N.Y. Organ Donor Network, Inc., 438 F.3d 214, 221 (2d Cir. 2006). "To overcome the presumption, the legal impossibility of recovery must be so certain as virtually to negate the plaintiff's good faith in asserting the claim." Schwartz v. Hitrons Sols., Inc., 397 F. Supp. 3d 357, 365 (S.D.N.Y. 2019) (internal quotation marks and citation omitted). The defendant is not limited to the pleadings in overcoming this presumption. At the motion to dismiss stage, a court must evaluate the jurisdictional facts pertaining to the amount in controversy based on the pleadings and "construe all ambiguities and draw all inferences" in the plaintiff's favor, Aurecchione v. Schoolman Transp. Sys., 426 F.3d 635, 638 (2d Cir. 2005), although when appropriate, a court "may look outside those pleadings to other evidence on the record." United Food & Commercial Workers Union Local 919, AFL-CIO v. CenterMark Props. Meriden Square Inc., 30 F.3d 298, 305 (2d Cir. 1994). "A district court retains considerable latitude in devising the procedures it will follow to ferret out the facts pertinent to jurisdiction."

APWU v. Potter, 343 F.3d 619, 627 (2d Cir. 2003) (internal quotation marks and citation omitted).

Here, Lend Bug argues that Katie failed to sufficiently plead that the amount in controversy meets the $75,000 jurisdictional threshold. (See Mem. at 8.) Katie contends that the allegations in Count One alone "place[] more than $75,000 in controversy." (Opp'n at 9.) Katie's specified forms of damages include: (1) actual damages of $12,754.08 garnished from its business account; (2) damages resulting from "restrained operating funds" – i.e., the $70,000 UCC hold and the $57,000 hold placed on its bank accounts – including reputational harm, disruption of business operations, and the loss of business opportunities; (3) damages resulting from the approximately $53,000 in emergency borrowed funds Katie required to cover payroll, operating expenses, and $15,200 in unpaid rent during the account freeze; (4) $197,203 in lost revenue from June through September 2025, as compared to the average monthly income during the same period during the previous two years; and (5) $32,000 in reduced business income. (FAC ¶¶ 77-82.)

Under New York law, "[c]ontract damages are ordinarily intended to give the injured party the benefit of the bargain by awarding a sum of money that will, to the extent possible,

put that party in as good a position as it would have been in had the contract been performed." Goodstein Const. Corp. v. City of New York, 80 N.Y.2d 366, 373 (N.Y. 1992).

First, Katie claims actual damages of $12,754.08 garnished from its business account. (See FAC ¶ 79.) However, pursuant to the Agreement, Katie was obligated to pay a total of $59,859.28 through a series of weekly $750 payments to Lend Bug. (See Agreement at 1.) As Lend Bug Notes, the alleged damages would therefore total to any interest amounted from the difference in paying the $12,754.08 up front versus paying that amount over a series of installments. (See Mem. at 9.)

Katie next alleges that Lend Bug's breach was "further compounded" by the $70,000 UCC hold and the $57,000 hold placed on its bank accounts – contending that the holds "result[ed] in a negative balance of $57,188.85" and asserting damages for "$69,754.08 in restrained operating funds." (FAC ¶¶ 53, 77-78.) As Lend Bug argues, any cognizable damages from frozen accounts are limited to actual injuries – not the amount of the freeze itself. (See Mem. at 10.) Here, Katie asserts that the holds forced the business to borrow approximately $53,000 in emergency funds required to cover payroll, operating expenses, and $15,200 in unpaid rent. (See FAC ¶ 80.) Katie contends that the restrained funds also

12

resulted in reputational harm, disruption of business operations, and the loss of business opportunities. (See id. ¶¶ 79-80.) While Lend Bug correctly notes that "[u]nder no circumstances could [Katie] force another entity to pay back their loan principle, and pay for their rent" (Mem. at 15), the other damages are cognizable consequential damages to which Katie could ultimately be entitled.

To recover consequential damages under New York law, the damages must be foreseeable to the parties. See, e.g., Bi-Econ. Mkt., Inc. v. Harleysville Ins. Co. of N.Y., 856 N.Y.S.2d 505, 508 (N.Y. 2008). To determine whether consequential damages were reasonably foreseeable, courts must look to "the nature, purpose and particular circumstances of the contract known by the parties . . . as well as what liability the defendant fairly may be supposed to have assumed consciously, or to have warranted the plaintiff reasonably to suppose that it assumed, when the contract was made." Kenford Co. v. Cnty. of Erie, 73 N.Y.2d 312, 319 (N.Y. 1989) (internal quotation marks and citation omitted).

Here, Katie alleges consequential damages flowing from Lend Bug's post-settlement conduct – i.e., Lend Bug's "fail[ing] to forbear from taking any collection action as

13

required under" the Agreement's terms. (FAC ¶ 82; Opp'n at 2.) Lend Bug contends that the Agreement "could never have required [Lend Bug] to pay consequential damages . . . when [it] had already been awarded valid judgments against [Katie]" (Mem. at 14), but at the motion to dismiss stage, "the inquiry is not whether plaintiff will be able to establish its claim, but whether plaintiff has stated a claim." D.K. Prop., Inc. v. Nat'l Union Fire Ins. Co. of Pittsburgh, 92 N.Y.S.3d 231, 233 (1st Dep't 2019). Therefore, the Court agrees with Katie that whether the alleged losses were foreseeable is a merits question unsuited to be resolved at the motion to dismiss stage.

Finally, Katie claims $197,203 in lost revenue from June through September 2025, as compared to the average monthly income during the same period during the previous two years and $32,000 in reduced business income. (See FAC ¶¶ 77-82.) As noted, when calculating damages, courts are guided by the principle that "[d]amages are intended to return the parties to the point at which the breach arose and to place the nonbreaching party in as good a position as it would have been had the contract been performed." Brushton-Moira Cent. Sch. Dist. v. Fred H. Thomas Assocs., P.C., 91 N.Y.2d 256, 261 (N.Y. 1998). Courts routinely recognize damages for lost

profits, calculated by deducting overhead expenses and costs from gross revenue. See, e.g., Mun. Credit Union v. Queens Auto Mall, Inc., 126 F. Supp. 3d 290, 298, n.4 (E.D.N.Y. 2015). Even if Lend Bug is correct that Katie fails to delineate how much of the alleged lost revenue amounts to cognizable damages, Lend Bug has not shown to a "legal certainty" the figure is less than the jurisdictional minimum. Colavito, 438 F.3d at 221.

In sum, the Court must resolve any doubts regarding whether the jurisdictional amount is met in Katie's favor. On the present record, the Court is not persuaded that the "legal impossibility of recovery" is so certain as to "negate" Katie's claim. Schwartz, 397 F. Supp. 3d at 365. As the Second Circuit has explained, "even where [the] allegations leave grave doubt about the likelihood of a recovery of the requisite amount, dismissal is not warranted." Zacharia v. Harbor Island Spa, Inc., 684 F.2d 199, 202 (2d Cir. 1982). Therefore, the Court declines to dismiss the First Amended Complaint for lack of subject matter jurisdiction.

C.    COUNTS SEVEN AND TWELVE

Although the Court declines to dismiss the entire action on jurisdictional grounds, the Court does dismiss Count Seven and Count Twelve. Despite Katie's argument, those counts are

15

supported by allegations that pre-date the Connecticut Judgment and the parties' subsequent Agreement. Accordingly, adjudication by this Court would violate the *Rooker-Feldman* doctrine. Although courts have held that the doctrine is meant to occupy a "narrow ground," the Second Circuit has explained that it applies to "cases brought by state-court losers complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced and inviting district court review and rejection of those judgments." Green v. Mattingly, 585 F.3d 97, 101 (2d Cir. 2009).

In Counts Seven and Twelve, Katie asserts violations of Connecticut General Statute § 37-4, New York General Obligations Law § 5-501(1), and New York Banking Law § 14-a(1), claiming Lend Bug violated various state usury laws. (See FAC ¶¶ 130-35, 161-69.) Katie supports those allegations by claiming that: (1) "Lend Bug's structure of the sale and purchase agreements was done to circumvent Connecticut's usury laws" (id. ¶ 134); and (2) "[a]lthough described as a 'merchant cash advance,' the transaction between [Katie] and . . . Lend Bug operated as a loan, because repayment was fixed, unconditional, and not contingent upon actual receivables. . . . The effective annualized rate of interest

16

on the refinance loan was approximately 40 to 50 percent, which far exceeds the lawful civil usury limit" (id. ¶ 164, 166). As noted, in March 2024, Katie contacted Lend Bug requesting a merchant cash advance. (See id. ¶¶ 9, 12.) Lend Bug loaned Katie approximately $25,000 in March 2024 pursuant to the Future Receivables Sale and Purchase Agreement and an additional $15,000 in April 2024. (See id. ¶¶ 12, 14, 41.) On June 6, 2024, after Katie was unable to pay the loan installments in full, Lend Bug filed an action in Connecticut Superior Court and received a judgment in its favor. (See id. ¶ 18.)

Katie argues that the "alleged injuries stem from [Lend Bug's] independent actions taken after judgment, including their post-settlement enforcement efforts and conduct flowing from the challenged agreement." (Opp'n at 14-15.) But that argument is not supported by the allegations in the First Amended Complaint. As Lend Bug argues, the usury claims are connected to the original merchant cash advance and subsequent Connecticut Judgment, and relitigating those issues here would violate the *Rooker-Feldman* doctrine. "Where claims raised in a federal action are 'inextricably intertwined' with a state court's determination," dismissal for lack of jurisdiction is proper. Botsas v. United States,

17

5 F. App'x 69, 70 (2d Cir. 2001). "[S]imply presenting in federal court a legal theory not raised in state court . . . cannot insulate a federal plaintiff's suit from *Rooker– Feldman* if the federal suit nonetheless complains of injury from a state court judgment and seeks to have that state-court judgment reversed." Edem v. Spitzer, 204 F. App'x 95, 97 (2d Cir. 2006) (internal quotation marks and citation omitted). Accordingly, the Court dismisses Count Seven and Count Twelve.

    D.   COUNT ONE

Katie's first cause of action – the breach of contract claim – asserts that Lend Bug violated the terms of the parties' Agreement because it "failed to forbear from taking any collection action as required under the express terms." (FAC ¶ 76.) Lend Bug asserts that even if its actions – *i.e.*, the garnishment of \$12,754.08 and the bank account holds – violated the Agreement, the Court lacks subject matter jurisdiction because Katie fails to show that the amount in controversy meets the jurisdictional minimum. (See Mem. at 8.) Because the Court addressed that argument above and found that Katie has adequately pleaded that there is a reasonable probability that the claimed damages are in excess of the

18

statutory jurisdictional amount, the Court denies Lend Bug's motion to dismiss Count One.

E.    COUNTS TWO, THREE, FOUR, AND FIVE

In Counts Two through Five, Katie alleges fraud and fraudulent misrepresentation, unjust enrichment, intentional interference with business relations, and conversion. (See FAC ¶¶ 83-120.) Lend Bug argues that each of those counts should be dismissed because they are duplicative of Katie's breach of contract claim. (See Mem. at 16.) The Court agrees, as "[t]here is no injury alleged here that a separate [tort] claim would include that is not already encompassed in [the] contract claim." IKB Int'l, S.A. v. Wells Fargo Bank, N.A., 40 N.Y.3d 277, 292 (N.Y. 2023) (internal quotation marks and citation omitted) (finding that non-contractual claims must be dismissed as duplicative when the damages alleged under the theories of recovery are identical).

Here, Katie bases the fraud and fraudulent misrepresentation claims on Kolb's alleged "false representations that 'Lend Bug had nothing to do with the freeze and garnishment of [Katie's] accounts, and that Lend Bug did not hold any UCC filings against [Katie].'" (FAC ¶ 85.) Assuming the truth of the allegations, the claimed fraud is not collateral or extraneous to the contract, see Glanzer

19

v. Keilin & Bloom LLC, 281 A.D.2d 371, 372 (1st Dep't 2001), Katie does not allege any damages that would not be recoverable under a contract measure of damages, see Makastchian v. Oxford Health Plans, Inc., 270 A.D.2d 25, 27 (1st Dep't 2000), and Katie fails to plead a breach of duty separate from a breach of the contract, see New York Univ. v. Cont'l Ins. Co., 87 N.Y.2d 308, 316 (N.Y. 1995). Katie alleges that Kolb made the statements to "avoid accountability for Lend Bug's breach of the settlement agreement" and "prevented [Katie] from receiving the benefits of the settlement agreement." (FAC ¶¶ 88, 95.)

Katie's unjust enrichment claim is also duplicative. "[P]leading unjust enrichment and breach of contract in the alternative can only occur if there is a genuine dispute as to the validity of the underlying agreement." Gan v. GSUIG Real Est. Member LLC, 797 F. Supp. 3d 69, 114 (E.D.N.Y. 2025). Katie does not argue that the Agreement is invalid. Thus, as Katie does not successfully plead unjust enrichment as an alternative theory to the breach of contract claim, the unjust enrichment claim is duplicative and must be dismissed. See Hanover Specialties, Inc. v. Les Revêtements Polyval Inc., No. 19-CV-3732, 2021 WL 964970, at *10 (E.D.N.Y. Mar. 15, 2021) (dismissing plaintiff's unjust enrichment claims as

duplicative because there was no genuine dispute as to the validity of the contract).

To assert intentional interference with business relations and conversion, Katie alleges that Lend Bug "intentionally interfered with . . . business relationships by placing the $70,000 UCC hold" and "effectively converting [Katie's] funds to its own use and control." (FAC ¶¶ 106, 113.) Here, however, Katie merely restates alleged breaches of contractual obligations. (See id. ¶ 107 (Lend Bug's "interference was intentional and designed to pressure [Katie] beyond the terms agreed upon in the settlement agreement"); id. ¶ 115 (Lend Bug's "placement of the UCC hold was wrongful because it violated the express terms of the May 29, 2025, settlement agreement").) Therefore, those claims are similarly duplicative. See Bayerische Landesbank, New York Branch v. Aladdin Cap. Mgmt. LLC, 692 F.3d 42, 58 (2d Cir. 2012) (finding that if "the basis of a party's claim is a breach of solely contractual obligations, such that the plaintiff is merely seeking to obtain the benefit of the contractual bargain through an action in tort, the claim is precluded as duplicative").

21

F.    COUNT SIX

In Count Six, Katie asserts violations of New York General Business Law § 349 ("Section 349"), which prohibits "[u]nfair, deceptive, or abusive acts or practices in the conduct of any business." (FAC ¶¶ 121-29); N.Y. Gen. Bus. Law § 349(a). Katie alleges that Lend Bug made "false representations . . . regarding [its] involvement in the freezing and garnishment of [Katie's] accounts" and that Lend Bug's collection of payments under the Agreement "while placing additional UCC holds" "constitute[d] a deceptive practice designed to mislead [Katie]." (FAC ¶¶ 123-24.)

"While [Section 349] does not preclude an action by one business against another, the gravamen of the complaint must be consumer injury or harm to the public interest." Azby Brokerage, Inc. v. Allstate Ins. Co., 681 F. Supp. 1084, 1089 n.6 (S.D.N.Y. 1988). "The critical question, then, is whether the matter affects the public interest in New York, not whether the suit is brought by a consumer or a competitor." Securitron Magnalock Corp. v. Schnabolk, 65 F.3d 256, 264 (2d Cir. 1995).

Katie argues that the consumer-oriented requirements of the statute are satisfied because the allegations include "deceptive conduct in the administration and enforcement of

merchant financing arrangements that are applied uniformly to similarly situated borrowers." (Opp'n at 13.) However, as discussed above, Katie's claims – those not barred by the *Rooker-Feldman* doctrine - do not stem from the original merchant financing agreement pursuant to which Lend Bug loaned Katie approximately $25,000 in March 2024. (See FAC ¶¶ 12, 14, 41.) Instead, they are based on the breach of the parties' Agreement – executed on May 29, 2025 - to resolve Lend Bug's attempts to collect on the Connecticut Judgment and establish a payment plan. (See id. ¶¶ 35, 40.)

Even if, as Katie asserts, Lend Bug "misrepresent[ed] the status of account restraints while simultaneously collecting settlement payments and pursuing additional UCC enforcement actions" (Opp'n at 12), the Court finds that those allegations fall under the purview of the private contractual dispute. The "gravamen of the complaint" is not consumer injury but the damages to Katie's business as a result of Lend Bug's alleged breach of the parties' Agreement, which set forth a bespoke payment plan. Accordingly, the Court finds that Katie cannot bring a claim pursuant to Section 349.

G.   COUNT ELEVEN

In Count Eleven, Katie asserts that Lend Bug violated UCC § 9-625(b) ("Section 9-625(b)") – which states that "a

23

person is liable for damages in the amount of any loss caused by a failure to comply with [Article 9]" - by "maintaining and initiating UCC liens as improper post-settlement collection devices rather than legitimate security interests." (FAC ¶ 155); UCC § 9-625. Katie alleges that the Agreement "required Lend Bug to release all UCC restraints within five (5) days of execution, establishing both a contractual and statutory duty to terminate any existing security interests by June 3, 2025," and that "instead of releasing those filings, Lend Bug placed additional UCC holds totaling approximately $70,000." (FAC ¶¶ 156-57.)

However, Katie's First Amended Complaint fails to point to a specific violation of UCC Article 9 that could be redressed by the remedial scheme set forth in Section 9-625(b). Although Katie may be correct that a plaintiff need not "plead statutory subsections with precision" (Opp'n at 16), Katie cannot simply assert that Lend Bug violated "Article 9's requirements." (FAC ¶ 159.) At a minimum, as Katie concedes, allegations must provide "fair notice of the claim and its factual basis." (Opp'n at 16.) As pleaded, the allegations asserted in the First Amended Complaint fall far short. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not

24

suffice." Iqbal, 556 U.S. at 678. Courts "are not bound to accept as true a legal conclusion couched as a factual allegation." Papasan v. Allain, 478 U.S. 265, 286 (1986). Accordingly, Count Eleven is dismissed for failure to state a claim.

### H.    COUNTS EIGHT, NINE, AND TEN

Katie brings Counts Eight, Nine, and Ten against defendant Kolb – Lend Bug's Director of Collections and agent – in her individual capacity, claiming tortious interference with business relations, defamation, and intentional infliction of emotional distress under Maryland law. (See FAC ¶¶ 136-52.)

In Count Eight, Katie alleges that Kolb took various actions that "were done with the intent to cause [Katie] harm in the form of dissuading both employees and clientele from returning to the salon." (Id. ¶ 139.) Among those acts, Katie alleges that Kolb intentionally disclosed details of Katie's financial condition and internal financial arrangements, threatened to name the salon receptionist in pending litigation, left disparaging comments on Katie's social media accounts, and improperly communicated with Katie's clientele. (Id. ¶ 138.)

Tortious interference with business relations under Maryland law "is committed when a third party's intentional interference with another in his or her business or occupation induces a breach of an existing contract or, absent an existing contract, maliciously or wrongfully infringes upon an economic relationship." Macklin v. Robert Logan Assocs., 639 A.2d 112, 117 (Md. 1994). "A claim for intentional interference with contractual or business relations requires the following elements: (1) intentional and willful acts; (2) calculated to cause damage to the plaintiffs in their lawful business; (3) done with the unlawful purpose to cause such damage and loss, without right or justifiable cause on the part of the defendants (which constitutes malice); and (4) actual damage and loss resulting." Kantsevoy v. LumenR LLC, No. CV-17-359, 2019 WL 1441982, at *25 (D. Md. Apr. 1, 2019) (internal quotation marks and citation omitted). "To establish causation in a tortious interference action, the plaintiff must prove that the defendant's wrongful or unlawful conduct proximately caused the injury alleged." Lyon v. Campbell, 707 A.2d 850, 860 (Md. Ct. Spec. App. 1998).

Here, the Court finds that Katie fails to sufficiently link Kolb's actions to the alleged damages, which Katie pleads as "business disruption" and "additional costs and expenses."

26

(FAC ¶ 141.) Courts have found that the "alleged wrongful conduct must have in fact terminated or negatively affected the prospective relationship." Baron Fin. Corp. v. Natanzon, 471 F. Supp. 2d 535, 546 (D. Md. 2006). Here, Katie claims Kolb interfered with Katie's employees and clientele, but Katie fails to assert how Kolb's actions proximately caused the damages alleged. Katie pleads "harm in the form of dissuading both employees and clientele from returning to the salon" (FAC ¶ 139), but Katie does not claim employees terminated their employment or that the business actually lost clients as a result of Kolb's actions. In short, Katie fails to plead any non-conclusory allegations establishing causation, and Count Eight is dismissed on that basis.

In Count Nine, Katie alleges defamation, contending that Kolb "made statements that were intended to expose [Katie] to public scorn, contempt, or ridicule." (FAC ¶ 143.) "In order to plead properly a defamation claim under Maryland law, a plaintiff must allege specific facts establishing four elements to the satisfaction of the fact-finder: (1) that the defendant made a defamatory statement to a third person, (2) that the statement was false, (3) that the defendant was legally at fault in making the statement, and (4) that the plaintiff thereby suffered harm." Piscatelli v. Van Smith,

27

424 Md. 294, 306 (Md. 2012) (internal quotation marks and citation omitted).

Lend Bug argues that Katie fails to allege specific facts sufficient to state a claim for defamation and that Kolb is protected by New York Civil Rights Law § 74, which states that "[a] civil action cannot be maintained against any person . . . for the publication of a fair and true report of any judicial proceeding[.]" N.Y. Civ. Rights L. § 74; (Mem. at 25-26). Because Kolb "summarized the judicial proceedings and stated that a Judgment was entered," Lend Bug contends that her alleged statements cannot be defamatory. (Mem. at 25-26.) While that argument might hold weight with regard to some of the statements contained within the First Amended Complaint, Katie also alleges that Kolb made statements that appear to be unrelated to the exact terms of the Connecticut Judgment, including "disparaging comments" posted on social media accounts. (FAC ¶ 143.) Because Katie has adequately pleaded the remaining elements of the claim, the Court is unpersuaded that the defamation cause of action should be dismissed at this stage of the litigation.

Finally, in Count Ten, Katie alleges intentional infliction of emotional distress, asserting that Kolb "acted with intentional desire to cause extreme distress because she

28

knew, or acted in deliberate disregard of, the likely extreme distress her acts were to cause." (Id. ¶ 150.) Courts have found that "extreme and outrageous" conduct must be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." Lasater v. Guttmann, 194 Md. App. 431, 448 (Md. Ct. Spec. App. 2010) (internal quotation marks and citation omitted). "Whether the conduct complained of meets this test is, in the first instance, for the court to determine[.]" Batson v. Shiflett, 325 Md. 684, 734 (Md. 1992).

Here, the Court finds that Kolb's alleged actions – for example, accusing the salon receptionist of lying, leaving disparaging comments on social media, or threatening to name the salon receptionist in pending litigation (see FAC ¶ 148) – fall far short of the types of "truly egregious acts" other courts have found sufficient to support this claim. Batson, 325 Md. 734; see, e.g., Figueiredo-Torres v. Nickel, 321 Md. 642 (Md. 1991) (psychologist had sexual relations with the plaintiff's wife during the time when he was treating the couple as their marriage counselor); Young v. Hartford Accident & Indemnity, 303 Md. 182 (Md. 1985) (worker's compensation insurer's "sole purpose" in insisting that

29

claimant submit to psychiatric examination was to harass her and force her to abandon her claim or to commit suicide). To adequately state a claim, the emotional distress complained of must be so severe that "no reasonable man could be expected to endure it." Harris v. Jones, 281 Md. 560, 571 (Md. 1977). Here, the Court is not persuaded that the allegations contained in the First Amended Complaint meet that standard. Accordingly, the Court dismisses Count Ten.

## IV.  ORDER

For the reasons stated above, it is hereby

**ORDERED** that the motion (Dkt. No. 51) filed by defendants Lend Bug, LLC, Lendbug 2, LLC, and Cynthia Kolb ("Kolb," and collectively, "Lend Bug") to dismiss the First Amended Complaint (Dkt. No. 37) of Lashes by Katie, LLC, and Thu Suong Dong (collectively, "Katie") is **GRANTED** in part and **DENIED** in part.

The Court dismisses Count Seven and Count Twelve on jurisdictional grounds. The Court denies Lend Bug's motion to dismiss Count One. The Court grants Lend Bug's motion to dismiss Counts Two, Three, Four, Five, Six, and Eleven. The Court grants Lend Bug's motion to dismiss Count Eight and Count Ten against Kolb. The Court denies Lend Bug's motion to dismiss Count Nine against Kolb.

30

**SO ORDERED.**

Dated:    23 March 2026
            New York, New York

Victor Marrero
U.S.D.J.